UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**PLATINUM PARTNERS VALUE ARBITRAGE**          CASE NO.: _____
**FUND LP**, a Delaware limited partnership,
**CENTURION STRUCTURED GROWTH LLC**,
a Delaware limited liability company, and **LEVEL
3 CAPITAL MANAGEMENT LP**,
a Delaware limited partnership,

      Plaintiffs,

v.

**BERENFELD SPRITZER SHECHTER &
SHEER, LLP,** a Florida limited liability
partnership, **TRACY WEINTRAUB**, an individual,
**GARY BERKOWITZ**, an individual, and **BRIAN
LEITSTEIN**, an individual,

      Defendants.

_____/

## COMPLAINT

Plaintiffs Platinum Partners Value Arbitrage Fund LP ("**Platinum**"), Centurion

Structured Growth LLC ("**Centurion**") and Level 3 Capital Management LP ("**Level 3**"

and, together with Platinum and Centurion, the "**Plaintiffs**"), by and through

undersigned counsel, sue Defendants, Berenfeld Spritzer Shechter & Sheer LLP

("**Berenfeld**"), Tracy Weintraub ("**Weintraub**"), Gary Berkowitz ("**Berkowitz**") and Brian

Leitstein ("**Leitstein**" and, together with Weintraub and Berkowitz, the "**Berenfeld

Partners**") and allege:

## INTRODUCTION

1.     This is an action for negligent misrepresentation and conspiracy against the Berenfeld accounting firm and several of its partners arising out of the notorious Ponzi scheme orchestrated by Scott Rothstein ("Rothstein") through his Fort Lauderdale based law firm Rothstein Rosenfeldt Adler, P.A. ("RRA").

2.     Plaintiffs Platinum, Centurion and Level 3 underwrote and funded loans to Banyon Investments, LLC, a Nevada limited liability company, Banyon Funding, LLC, a Nevada limited liability company and Banyon Resources, LLC, a Nevada limited liability company (the "Banyon Entities", and together with RRA, the "Berenfeld Clients"). The Banyon Entities then used the funds loaned by Plaintiffs to purchase what the Banyon Entities represented to be structured settlements.

3.     The financial statements and records disclosed to Plaintiffs for the purpose of inducing the loans were materially false and misleading. As a result of their collective loans to the Banyon Entities, Plaintiffs were ultimately defrauded out of over $20 million.

4.     Defendant Berenfeld served as the accounting firm for RRA and Rothstein during the time period Rothstein executed his fraudulent scheme, as well as the auditor for the Banyon Entities during the same time period. Defendants Tracy Weintraub, Gary Berkowitz and Brian Leitstein are the Berenfeld Partners who were responsible for the Banyon Entities, RRA and Rothstein accounts during the relevant time period.

5.     As described herein, Berenfeld and the Berenfeld Partners were instrumental in Rothstein's implementation and perpetuation of his conspiracy to defraud innocent lenders such as Plaintiffs. Moreover, by knowingly delivering false

financial statements for the Berenfeld Clients to lenders with the expectation that lenders would detrimentally rely on those false financial statements, Berenfeld and the Berenfeld Partners became Rothstein's co-conspirators. Berenfeld and the Berenfeld Partners' assistance in Rothstein's falsification of the Berenfeld Clients' financials was critical; it prevented Plaintiffs from discovering Rothstein's fraud.

6. Plaintiffs are thus victims of both Rothstein and Berenfeld's conduct—crimes to which Rothstein has since pled guilty.[1] Plaintiffs' injuries are pecuniary in nature, are readily quantifiable, and are demonstrable with business records maintained by Plaintiffs in the ordinary course of its business.

7. This action is brought to hold Berenfeld and the Berenfeld Partners accountable for the millions of dollars of damages suffered by Plaintiffs as a consequence of Berenfeld and the Berenfeld Partners' facilitation of and complicity in Rothstein's fraud.

## PARTIES, JURISDICTION AND VENUE

8. Platinum is a Cayman Islands exempted limited partnership whose general partner, Platinum Management (NY) LLC, is organized under Delaware law and has its principal place of business in New York, New York.

9. Centurion is a Delaware limited liability company with its principal place of business in New York, New York.

10. Level 3 is a Delaware limited partnership with its principal place of business in New York, New York.

[1] On June 9, 2010 in the case styled *United States v. Rothstein*, 09-60331-JIC (S.D. Fla. 2009), United States District Judge James I. Cohn sentenced Rothstein to 50 years for his crimes.

11.     Defendant Berenfeld is a Florida limited liability partnership with offices in Coral Gables, Florida and Fort Lauderdale, Florida. From July, 2007 until the closure of RRA in early November, 2009, Berenfeld served as RRA's accounting firm. Berenfeld also provided accounting services to Rothstein individually, and served as the Banyon Entities' auditing firm during the time period relevant to this action.

12.     Weintraub is *sui juris* and resides in Broward County, Florida, and, at all times material hereto, was acting within the scope of his employment as the Senior Audit and Managing Partner of Berenfeld's Fort Lauderdale office. Weintraub was also a partner on the Executive Committee at Berenfeld during the relevant time period.

13.     Berkowitz is *sui juris* and resides in Broward County, Florida and, at all times material hereto, was acting within the scope of his employment as a Certified Public Accountant of Berenfeld.

14.     Leitstein is *sui juris* and resides in Broward County, Florida and, at all times material hereto, was acting within the scope of his employment as Audit Manager of Berenfeld.

15.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

16.     This Court has jurisdiction over Berenfeld, Weintraub, Berkowitz and Leitstein in that, as alleged herein, defendants each conduct business and reside in Broward County, Florida and the conduct alleged herein occurred in Florida.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because each of the defendants conduct business or reside within the District.

18.     All conditions precedent to the filing of this action have either occurred, or have been performed, excused or waived.

## GENERAL ALLEGATIONS

### The Rothstein Ponzi Scheme

19.     This case arises out of the Rothstein Ponzi scheme that defrauded investors and lenders—including Plaintiffs—out of hundreds of millions of dollars.

20.     Rothstein executed his scheme as follows. First, Rothstein represented to prospective investors that supposed clients of RRA had settled claims with ostensible defendants of these claims who were obligated to pay settlement proceeds to RRA for the benefit of the RRA client over an extended period of time. Rothstein then represented to investors that his "clients" were willing to assign their interests in the "settlement" payment stream in exchange for a discounted lump sum payment up front.

21.     Rothstein convinced investors to "purchase" these settlement payment streams by promising extraordinary return rates on their investments. Rothstein sustained his fraudulent scheme by paying previous investors dividends with the money he obtained from subsequent investors.

22.     Critical to accomplishing his scheme, Rothstein would provide prospective investors with fictitious documents including purported copies of a redacted contingency fee agreement between RRA and a "client," a settlement agreement between the "client" and the purported "defendant", a sale and transfer agreement, an acknowledgement of assignment/purchase of settlement proceeds agreement, a guaranty executed by Rothstein both personally and on behalf of RRA, a defense agreement, a copy of the a redacted wire transfer confirmation purporting to evidence

the payment of the "settlement" proceeds into RRA's trust account, and correspondence detailing the transaction on RRA's letterhead.

23. These financial statements and records were materially false and misleading, and induced Plaintiffs to make loans to the Banyon Entities. When all was said and done, Plaintiffs were ultimately defrauded out of over $20 million. .

## Berenfeld's Decisive Importance to Rothstein's Successful Execution of the Ponzi Scheme

### The Berenfeld/Rothstein Symbiotic Relationship

24. Weintraub, the Managing Partner at Berenfeld, is a childhood friend of Rothstein. As a result of Weintraub's close relationship with Rothstein, Berenfeld was engaged by Rothstein to perform professional accounting services for RRA, the Banyon Entities and Rothstein individually.

25. Due to Rothstein and Weintraub's close personal friendship, several of Weintraub's major clients were Rothstein referrals, which resulted in significant profits for Berenfeld and Weintraub personally. Rothstein also gave Weintraub lavish gifts, and often used RRA funds to sponsor events for Weintraub's benefit.

26. From 2007 through the discovery of Rothstein's fraud, Berenfeld billed and collected over $120,000 in fees for the work it performed for RRA alone.

27. In exchange for the significant financial benefits that Weintraub received as a result of his relationship with Rothstein, Berenfeld and the Berenfeld Partners protected Rothstein and never challenged his actions to the detriment of Plaintiffs and other lenders and investors.

**Berenfeld's Deliberate Ignorance of Rothstein's Fraudulent Conduct**

28.    As RRA's accountants, Berenfeld and the Berenfeld Partners were responsible for preparing RRA's 2005,[2] 2006 and 2007 tax returns, providing consulting services, compiling financial statements, bank account reconciliations, staffing for RRA's internal bookkeeping operations, and credit card reconciliations.

29.    Additionally, between September 2008 and February 2009, Berenfeld conducted an audit of the Banyon Entities for the period ending December 31, 2007 and a review for the period ending June 30, 2008.  Weintraub, Berkowitz and Leitstein were the Berenfeld accountants who prepared the audited financial statements for the Banyon Entities (the "Auditors' Report").[3]

30.    As part and parcel of their accounting responsibilities, Berenfeld and the Berenfeld Partners had access to the Berenfeld Clients' books and records from mid-2007 up through the date RRA closed its doors in late 2009.

31.    Despite the fact that these books and records revealed inconsistent, incomplete, and incorrect financial accounting for the Berenfeld Clients under Rothstein and the Banyon Entities' orders, Berenfeld and the Berenfeld Partners never voiced their concerns to Plaintiffs with respect to the Berenfeld Clients' faulty financial records.

32.    Moreover, given their unique position as both RRA's accountants and Banyon's auditors, Berenfeld and the Berenfeld Partners had first-hand knowledge of the patent inconsistencies between Banyon's audited receivables and RRA's actual financials.  Specifically, Weintraub, as the originator and concurring audit partner on the

---

[2] The 2005 return was already late when Berenfeld began to prepare it for RRA in 2007.

[3] A true and correct copy of the Auditors' Report is attached hereto as Exhibit A.

Banyon Entities audits, had knowledge of and full access to Banyon's financial information as well as RRA and Rothstein's financial information.

33. Given the overwhelming evidence of Rothstein's scheme to defraud investors and lenders that Berenfeld and the Berenfeld Partners were confronted with, they knew or should have known of Rothstein's Ponzi scheme as early as 2007. Instead, Berenfeld and the Berenfeld Partners elected to turn a blind eye when presented with obvious "red flags":

- Berenfeld and the Berenfeld Partners knew or should have known of the inaccurate RRA bookkeeping and inadequacy of RRA's accounting personnel evidenced by the way in which the books and records were created and maintained, leading to substantial adjustments which were tantamount to rewriting the RRA books and records;

- Berenfeld and the Berenfeld Partners knew or should have known that RRA's operating cash balances were significantly overdrawn at the end of each year from 2005 to 2008;

- Berenfeld and the Berenfeld Partners knew or should have known that RRA's payroll accounts were running large negative daily balances and that NSF (not sufficient funds) charges were extensively incurred;

- Berenfeld and the Berenfeld Partners knew or should have known that RRA was paying bills for credit cards that Rothstein, his wife, as well as other employees used and that the credit cards were used to pay for substantially all costs and expenses of the law firm;

- Berenfeld knew or should have known that between 2005 and October 2009, Rothstein incurred approximately $22 million in credit card charges and that RRA was not generating enough income to cover these extraordinary expenses;

- Berenfeld and the Berenfeld Partners knew or should have known that Rothstein gave lavish gifts to those who had access to RRA's financial information—information that was withheld from Plaintiffs;

- Berenfeld and the Berenfeld Partners observed that RRA's trust accounts did not contain investor funds in amounts commensurate with the vast sums that RRA's books and records reflected as held in trust;

- Berenfeld and the Berenfeld Partners observed that tens of millions of dollars of "loans/fee income" were being deposited into RRA's trust and operating accounts without any documentation supporting the shifting of the revenues from trust accounts to operating and payroll accounts;

- Berenfeld and the Berenfeld Partners knew or should have known that the revenue reflected in RRA's books and records was not "fee income," as Rothstein insisted it was, but took no steps to determine and document the true source of that revenue;

- Berenfeld and the Berenfeld Partners knew or should have known that the information being provided concerning transfers from trust accounts were nonsensical but did not attempt to discover the true source of these transfers despite the fact that this information was readily available in the documentation concerning the Banyon Entities audit;

- Berenfeld and the Berenfeld Partners knew or should have known that excluding Stuart Rosenfeldt, a President and 50% shareholder of RRA, from access to accounting information in its possession was contrary to standard operating procedures and professional standards but chose to follow Rothstein's directions not to provide Rosenfeldt with access to RRA's accounting information;

- Berenfeld and the Berenfeld Partners did not insist upon seeing copies of RRA's bank statements despite the incredible numbers been provided to them;

- Berenfeld and the Berenfeld Partners did not obtain a better understanding of the confidential settlement purchase business model in order to better formulate proper verification procedures.

34. By engaging in a strategy of deliberate ignorance—which included failing to ask the questions they were obligated to ask as the Berenfeld Clients' accountants, and failing to withdraw as the Berenfeld Clients' accountants in light of the circumstances then known to them—Berenfeld and the Berenfeld Partners failed to perform accounting services in conformity with their basic professional obligations. Had Berenfeld and the Berenfeld Partners properly discharged their professional obligations and timely exposed Rothstein's insidious fraud, Plaintiffs would not have loaned monies

to the Banyon Entities, and, accordingly, would not have suffered the substantial losses for which they now seek recompense.

## *Berenfeld's Active Participation in Rothstein's Scheme*

35.    Berenfeld and the Berenfeld Partners' egregious conduct was not limited solely to burying their heads in the sand when confronted with overwhelming evidence of Rothstein's fraudulent conduct. Berenfeld and the Berenfeld Partners also actively participated in Rothstein's conspiracy by, most notably, falsifying financial statements for the Berenfeld Clients.

36.    For example, Berenfeld and the Berenfeld Partners' Auditors' Report of the Banyon Entities—which Berenfeld and the Berenfeld Partners knew or should have known was being incorporated into various Confidential Offering Memorandum ("Memorandum") provided to investors and lenders—purported to authenticate in excess of $517 million of non-existent receivables.

37.    The Memorandum, in turn, relying heavily on the Auditors' Report, indicated that by March 2009, the Banyon Entities had purchased $1.1 billion dollars worth of settlements from Rothstein for $657 million, (equating to over $531 million in returns), and had receivables in excess of $559 million. These figures, of course, were entirely fabricated.

38.    Moreover, Berenfeld and the Berenfeld Partners sent confirmations, during their 2007 audit of the Banyon Entities, to Rothstein in order to verify $42 million of investments held in attorney trust accounts, however no corresponding liabilities were reflected on RRA's income tax return or trial balance. Likewise, for the 2008 Banyon Entities audit, Berenfeld and the Berenfeld Partners sent confirmation to substantiate

$545,000,000 of investments purportedly held in attorney trust accounts, yet the RRA

trial balance reflected no such cash balance or corresponding trust liability.

39.    The fictitious financial statements verified by Berenfeld and the Berenfeld

Partners, in conjunction with the Memorandum, induced Plaintiffs and other investors

and lenders to invest and loan funds, and thus were critical to the execution of

Rothstein's Ponzi scheme.

40.    In furtherance of Rothstein's scam and the conspiracy, Berenefeld and the

Berenfeld Partners also engaged in several other affirmative acts in contravention of

their professional responsibilities:

- Berenfeld and the Berenfeld Partners signed RRA's tax returns despite the fact that their requests for detailed information concerning trust accounts and fee income was rebuffed;

- Berenfeld and the Berenfeld Partners prepared tax returns that reported client trust funds in a way that did not distinguish between RRA operating cash and client trust finds, giving the misimpression that RRA had more available cash than it actually owned;[4]

- Berenfeld and the Berenfeld Partners failed to comply with Berenfeld's own quality control standards by not completing necessary checklists. The RRA work-papers produced by Berenfeld do not include copies of their "Tax Return Preparation Checklist" which indicates it is a "guideline" and "to be used as a working tool in preparation and self-review of tax returns";

- Berenfeld and the Berenfeld Partners prepared the 2006 financial statements without an accountants' report which should have indicated the level of services being performed;

- Berenfeld sent RRA's 2006 financial statements to third parties, without indicating whether the financial statement was the product of a "compilation," or "review" in violation of the American Institute of Certified Public Accountants' reporting requirements;[5]

---

[4] Client trust funds are commonly listed on a balance sheet as an "Other Current Asset" along with an offsetting "Other Current Liability" and not as "Cash."

[5] When a CPA is engaged to compile a financial statement or if the CPA has knowledge that the financial statement being compiled will be used by parties other than the client, then the CPA must attach a

- Berenfeld and the Berenfeld Partners prepared 2006 financial statements for RRA that reflected current liabilities in excess of current assets, positive available cash of only approximately $4,000, and distributions made of 99% of the alleged current year's net income;

- Berenfeld and the Berenfeld Partners adjusted RRA's 2007 and 2008 income by almost $95,000,000 under suspicious circumstances. Berenfeld and the Berenfeld Partners reclassified this liability as income in order to keep the books balanced;

- In response to an anti-money laundering compliance inquiry from Gibraltar Bank, Berenfeld and the Berenfeld Partners provided Rothstein with a letter to help him cover up $15,000,000 in suspicious transactions. Then, at Rothstein's direction, Berenfeld and the Berenfeld Partners removed disclaimer language in the letter that certain information was not "verified".

41. By, among other things, participating in the falsification of the books and records of the Berenfeld Clients, verifying the Banyon Entities' fictitious receivables, and faithfully signing RRA's tax returns year after year despite RRA's glaring financial irregularities, Berenfeld and the Berenfeld Partners were critical to the successful implementation of Rothstein's scheme.

## Accountant Liability to Third Parties

42. When an accountant fails to exercise reasonable and ordinary care in preparing financial statements for a client, and those statements are presented to a third party in order to induce the third party to invest or loan to the client, the accountant is liable to the third party for damages sustained.

43. Defendants intended their work product for the Berenfeld Clients, including but not limited to the materially false financial statements, audits, compilations and other papers, to reach and influence a particular person or group of persons and that those

---

compilation report which indicates the level of service and the reliance or lack thereof that the third party should ascribe to those financial statements.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

persons, who had access to the information, would foreseeably take some action in reliance upon their work product.

44.    Berenfeld and the Berenfeld Partners owed Plaintiffs a duty of care because they knew or had reason to know that the information contained in the audited financial statements they prepared for the Berenfeld Clients was going to be used by Rothstein to induce Plaintiffs to loan funds to the Banyon Entities, and that Plaintiffs would in turn rely on those statements in deciding whether or not to make such loans.

45.    Berenfeld and the Bernefeld Partners breached their duty to Plaintiffs by knowingly providing the Berenfeld Clients' false financial statements on which Plaintiff untimely relied when deciding whether to loan funds to the Banyon Entities.

## COUNT I
## (Negligent Misrepresentation against Berenfeld)

46.    Plaintiffs re-allege and incorporate by reference paragraphs 1-45 above, as if fully set forth herein.

47.    Rothstein was operating a Ponzi scheme through his law firm, RRA, and engaged Berenfeld to provide accounting services for RRA.    Berenfeld was simultaneously engaged to provide auditing services for the Banyon Entities.

48.    Berenfeld knew or should have known that Plaintiffs were placing trust and confidence in Berenfeld and relying on Berenfeld to inform them as to the Berenfeld Clients' true financial position.

49.    Berenfeld owed Plaintiffs a duty of care to provide professionally sound, correct and ethical services in connection with the Berenfeld Clients engagements.

50.    In connection with its representation of the Berenfeld Clients, Berenfeld made several material misrepresentations and/or omissions in direct contravention of

their professional accounting obligations and in furtherance of the Rothstein Ponzi scheme.

51. In furtherance of the Rothstein Ponzi scheme, Berenfeld made materially false statements and representations, including but not limited to, preparing and providing false financial statements, preparing tax returns that were materially inaccurate, and using information from Rothstein that it knew was incorrect, incomplete or inconsistent.

52. When making the false statements and representations, Berenfeld knew or reasonably should have known that they were false.

53. Berenfeld knew that Rothstein intended to supply the false financial statements Berenfeld prepared for the Berenfeld Clients to Plaintiffs in order to induce Plaintiffs to loan funds to the Banyon Entities that were then used in Rothstein's scam.

54. Berenfeld breached its common law and professional duties to Plaintiffs by making false representations and material omissions knowing and intending that Plaintiffs would rely on them.

55. Plaintiffs justifiably relied upon Berenfeld's false representations and material omissions to their detriment.

56. As a direct and proximate result of Berenfeld's false representations and material omissions, Plaintiffs have sustained damages.

WHEREFORE, Plaintiffs demand judgment against BERENFELD SPRITZER SHECHTER & SHEER, CPA LLP for damages in excess of $20 million, plus interest, costs and all other relief that the Court deems just and proper.

## COUNT II
### (Negligent Misrepresentation against Weintraub, Berkowitz and Leitstein)

57. Plaintiffs re-allege and incorporate by reference paragraphs 1-45 above, as if fully set forth herein.

58. Rothstein was operating a Ponzi scheme through his law firm, RRA, and engaged Berenfeld and the Berenfeld Partners to provide accounting services for RRA. Berenfeld and the Berenfeld Partners were simultaneously engaged to provide auditing services for the Banyon Entities.

59. Weintraub, Berkowitz and Leitstein knew that Plaintiffs were placing trust and confidence in Weintraub, Berkowitz and Leitstein and relying on Weintraub, Berkowitz and Leitstein to inform them as to the Berenfeld Clients' true financial position.

60. Weintraub, Berkowitz and Leitstein owed Plaintiffs a duty of care to provide professionally sound, correct and ethical services in connection with the Berenfeld Clients engagement.

61. In furtherance of the Rothstein Ponzi scheme, Weintraub, Berkowitz and Leitstein made material false statements and representations including, but not limited to, preparing and providing false financial statements, preparing tax returns that were materially inaccurate, and using information from Rothstein that they knew was incorrect, incomplete or inconsistent.

62. When making the false statements and representations, Weintraub, Berkowitz and Leitstein knew or reasonably should have known that they were false.

63. Weintraub, Berkowitz and Leitstein knew that Rothstein intended to supply the false financial documents they prepared for the Berenfeld Clients to Plaintiffs in

order to induce Plaintiffs to loan funds to the Banyon Entities that were then used to invest in Rothstein's scam.

64.     Weintraub, Berkowitz and Leitstein breached their common law and professional duties to Plaintiffs by making false representations and material omissions knowing and intending that Plaintiffs would rely on them.

65.     Plaintiffs justifiably relied upon Weintraub, Berkowitz and Leitstein's false representations and material omissions to their detriment.

66.     As a direct and proximate result of Weintraub, Berkowitz and Leitstein's false representations and material omissions, Plaintiffs have sustained damages.

WHEREFORE, Plaintiffs demand judgment against TRACY WEINTRAUB, GARY BERKOWTIZ and BRIAN LEITSTEIN for damages in excess of $20 million, plus interest, costs and all other relief that the Court deems just and proper.

## COUNT III
### (Civil Conspiracy to Defraud against Berenfeld)

67.     Plaintiffs re-allege and incorporate by reference paragraphs 1-45 above, as if fully set forth herein.

68.     Berenfeld knowingly acted in concert with Rothstein, the Berenfeld Partners and other co-conspirators—both known and unknown—to implement an illegal Ponzi scheme.  In doing so, Berenfeld acted with full knowledge and awareness that its activities and those of its co-conspirators were designed to give the false impression of the existence of legitimate investment and lending opportunities when in fact the opportunities were blatant fabrications.

69.     Berenfeld, Rothstein, the Berenfeld Partners and the other co-conspirators acted in their respective roles according to a predetermined and commonly understood

and accepted plan of action all for the purpose of obtaining substantial funds from investors and lenders, including Plaintiffs.

70. The overt acts of Berenfeld, Berenfeld Partners, Rothstein and the other co-conspirators were contrary to law.

71. There was a meeting of the minds between and among Berenfeld, the Berenfeld Partners, Rothstein and the other co-conspirators to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful overt acts proximately caused and continues to cause Plaintiffs damages.

72. Rothstein's, Berenfeld's, the Berenfeld Partners' and the other co-conspirators' conduct has directly caused injury and damage to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against BERENFELD SPRITZER SHECHTER & SHEER, CPA LLP for damages in excess of $20 million, plus interest, costs and all other relief that the Court deems just and proper.

## COUNT IV
### (Civil Conspiracy to Defraud against Weintraub, Berkowitz and Leitstein)

73. Plaintiffs re-allege and incorporate by reference paragraphs 1-45 above, as if fully set forth herein.

74. Weintraub, Berkowitz and Leitstein knowingly acted in concert with Rothstein, Berenfeld and other co-conspirators—both known and unknown—to implement an illegal Ponzi scheme. In doing so, Weintraub, Berkowitz and Leitstein acted with full knowledge and awareness that their activities and those of their co-conspirators were designed to give the false impression of the existence of legitimate investment and lending opportunities when in fact the opportunities were blatant fabrications.

75. Weintraub, Berkowitz, Leitstein, Berenfeld, Rothstein and the other co-conspirators acted in their respective roles according to a predetermined and commonly understood and accepted plan of action all for the purpose of obtaining substantial funds from investors and lenders, including Plaintiffs.

76. The overt acts of Weintraub, Berkowitz, Leitstein, Berenfeld, Rothstein and the other co-conspirators were contrary to law.

77. There was a meeting of the minds between and among Weintraub, Berkowitz, Leitstein, Rothstein, Berenfeld, and the other co-conspirators to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful overt acts proximately caused and continues to cause Plaintiffs damages.

78. Weintraub's, Berkowitz's, Leitstein's, Rothstein's, Berenfeld's, and other co-conspirators' conduct has directly caused injury and damage to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against TRACY WEINTRAUB, GARY BERKOWTIZ and BRIAN LEITSTEIN for damages in excess of $20 million, plus interest, costs and all other relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

jury on all issues so triable.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
*Counsel to Plaintiffs*
1450 Brickell Ave., Suite 2300
Miami, Florida 33131
Telephone: 305-374-7593
Facsimile: 305-351-2253

By: ___/s/ Michael N. Kreitzer___
      Michael N. Kreitzer, Esq.
      Florida Bar No. 705561
      mkrietzer@bilzin.com
      Lori Lustrin
      Florida Bar No. 59228
      llustrin@bilzin.com

# EXHIBIT "A"



## INDEPENDENT AUDITORS' REPORT

To the Members of
Banyon 1030-32, LLC and Affiliates
Fort Lauderdale, Florida

We have audited the accompanying consolidated balance sheets of Banyon 1030-32, LLC and Affiliates (a limited liability company) as of December 31, 2008 and 2007, and the related consolidated statements of income, changes in members' equity and cash flows for the year ended December 31, 2008 and for the period from inception (December 22, 2006) to December 31, 2007. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Banyon 1030-32, LLC and Affiliates as of December 31, 2008 and 2007, and the results of its consolidated operations and its consolidated cash flows for the year ended December 31, 2008 and for the period from inception (December 22, 2006) to December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.

*Berenfeld Spritzer Shechter & Sheer LLP*

Fort Lauderdale, Florida
March 1, 2009

1

**Berenfeld Spritzer Shechter & Sheer LLP**
2525 Ponce de Leon Boulevard, Fifth Floor, Coral Gables, FL 33134   305.274.4600 main   305.274.4601 fax
401 East Las Olas Boulevard, Suite 1090, Ft. Lauderdale, FL 33301   954.728.3740 main   954.728.3798 fax          berenfeldLLP.com

**BANYON 1030-32, LLC AND AFFILIATES**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2008 AND 2007**

### Assets

| Current Assets: | 2008 | 2007 |
|---|---|---|
| Cash | $ 8,841,604 | $ 80 |
| Finance receivables, net | 332,881,393 | 27,095,887 |
| Due from related party | 10,342,584 | - |
| Total Current Assets | 352,065,481 | 27,095,967 |
| **Property and Equipment:** | | |
| Office condominium | 3,733,314 | - |
| Aircraft | 2,940,000 | - |
| Land | 406,600 | - |
| Furniture and fixtures | 2,290 | - |
| Less: Accumulated depreciation | (123,368) | - |
| Property and equipment, net | 6,958,836 | - |
| **Other Assets:** | | |
| Finance receivables, long term portion | 7,501,908 | 513,550 |
| Due from related party, long term | 2,074,962 | - |
| Other assets | 2,165,997 | - |
| Total Other Assets | 11,742,867 | 513,550 |
| **Total Assets** | $ 370,767,184 | $ 27,609,517 |

### Liabilities and Members' Equity

| Current Liabilities: | | |
|---|---|---|
| Notes payable, current | $ 204,764,130 | $ 4,528,618 |
| Accounts payable and accrued expenses | 6,069,806 | 150,724 |
| Accrued interest payable | 2,442,692 | - |
| Claims payable | 41,376,578 | 1,608,000 |
| Due to investors | 3,979,795 | - |
| Total Current Liabilities | 258,633,001 | 6,287,342 |
| **Other Liabilities:** | | |
| Notes payable, net of current portion | 1,804,215 | - |
| Interest rate swap contract liability | 209,121 | - |
| Security deposits | 31,016 | - |
| Total Other Liabilities | 2,044,352 | - |
| **Total Liabilities** | 260,677,353 | 6,287,342 |
| **Members' Equity** | 110,089,831 | 21,322,175 |
| **Total Liabilities and Members' Equity** | $ 370,767,184 | $ 27,609,517 |

See accompanying notes to the consolidated financial statements.

2

BANYON 1030-32, LLC AND AFFILIATES
CONSOLIDATED STATEMENTS OF INCOME
FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE
PERIOD FROM INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

|  | 2008 | 2007 |
|---|---|---|
| **Revenues:** | | |
| Finance revenue | $ 146,005,125 | $ 7,956,654 |
| Total revenues | 146,005,125 | 7,956,654 |
| **Operating expenses:** | | |
| Interest expense | 39,334,386 | 145,787 |
| Commissions | 201,266 | - |
| Management fees | 808,030 | - |
| Charter expenses | 165,561 | - |
| Business expense | 66,279 | 355 |
| Other operating expenses | 630,771 | 2,875 |
| Total operating expenses | 41,206,293 | 149,017 |
| **Operating Income** | 104,798,832 | 7,807,637 |
| **Other Income (expense):** | | |
| Rental income | 159,641 | - |
| Interest income | 165,997 | - |
| Depreciation expense | (123,368) | - |
| Total other income | 202,270 | - |
| **Net income** | $ 105,001,102 | $ 7,807,637 |
| **Comprehensive Income:** | | |
| Net income | $ 105,001,102 | $ 7,807,637 |
| Other comprehensive (loss): | | |
| Unrealized loss on interest rate swap agreement | (209,121) | - |
| **Comprehensive income** | $ 104,791,981 | $ 7,807,637 |

See accompanying notes to the consolidated financial statements.

3

### BANYON 1030-32, LLC AND AFFILIATES
### CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY
### FOR THE PERIOD FROM INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2008

| | | |
|---|---|---:|
| Capital contributions | $ | 17,631,100 |
| Distributions | | (4,116,562) |
| Net income | | 7,807,637 |
| Balance, December 31, 2007 | | 21,322,175 |
| Capital contributions | | 2,943,061 |
| Distributions | | (18,967,386) |
| Net income | | 105,001,102 |
| Other comprehensive loss | | (209,121) |
| Balance, December 31, 2008 | $ | 110,089,831 |

See accompanying notes to the consolidated financial statements.

4

BANYON 1030-32, LLC AND AFFILIATES
CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE
PERIOD FROM INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

|  | 2008 | 2007 |
|---|---|---|
| **Cash Flows from Operating Activities:** |  |  |
| Net income | $ 105,001,102 | $ 7,807,637 |
| Adjustment to reconcile net income |  |  |
| to net cash (used in) operating activities: |  |  |
| Accretion of unearned income | (146,005,125) | (7,956,654) |
| Depreciation expense | 123,368 | - |
| Change in operating assets and liabilities: |  |  |
| Other assets | (2,165,997) | - |
| Finance receivable collections | 302,811,249 | 12,725,362 |
| Finance receivable purchases, including |  |  |
| acquisition costs | (466,600,193) | (32,378,165) |
| Accounts payable and accrued expenses | 5,919,082 | 150,724 |
| Accrued interest payable | 2,442,692 | - |
| Claims payable | 39,768,578 | 1,608,000 |
| Security deposits | 31,016 | - |
| Net cash (used in) operating activities | (157,674,228) | (18,043,076) |
| **Cash Flows from Investing Activities:** |  |  |
| Purchase of property and equipment | (5,232,204) | - |
| Net cash used in investing activities | (5,232,204) | - |
| **Cash Flows from Financing Activities:** |  |  |
| Proceeds from notes payable | 368,727,505 | 4,821,643 |
| Principal payments on notes payable | (168,537,778) | (293,025) |
| Advances to related parties | (12,417,546) | - |
| Member capital contributions | 2,943,061 | 17,631,100 |
| Distributions to members | (18,967,386) | (4,116,562) |
| Net cash provided by financing activities | 171,747,856 | 18,043,156 |
| Net increase in cash | 8,841,424 | 80 |
| Cash, Beginning of Period | 80 | - |
| Cash, End of Period | $ 8,841,504 | $ 80 |
| **Supplemental disclosure of cash flow information:** |  |  |
| Interest paid | $ 36,891,694 | $ 145,787 |
| **Supplemental disclosure of non-cash investing and financing activities:** |  |  |
| Debt incurred in acquisition of property | $ 1,850,000 | $ - |

See accompanying notes to the consolidated financial statements.

5

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

### NOTE 1 - Summary of Significant Accounting Policies and Other Information

#### Principles of Consolidation

The consolidated financial statements for the year ended December 31, 2008 include the accounts of Banyon 1030-32, LLC ("Banyon 1030-32"), Banyon Capital, LLC ("Banyon Capital"), Banyon Funding, LLC ("Banyon Funding"), Banyon Investments, LLC ("Banyon Investments"), Banyon Resources, LLC ("Banyon Resources"), and Galleria Aviation, LLC ("Galleria Aviation"), herein collectively referred to as the "Company". All significant intercompany transactions and balances have been eliminated in consolidation.

Banyon Capital, Banyon Funding, Banyon Investments, Banyon Resources and Galleria Aviation commenced operations in 2008. Therefore, the financial statements as of and for the period ended December 31, 2007 include the accounts of Banyon 1030-32 only.

#### Nature of Activities

The Company's primary business is as a specialty finance company that originates, securitizes and services rights to receive payments from legal settlements and other deferred payment obligations. Deferred payment obligations are contractual arrangements under which one party has agreed to make fixed, scheduled payments to another party ("the claimant") over time to satisfy an obligation.

"Origination" of legal settlement receivables refers to the Company's purchase of the rights to receive payments, not the origination of the underlying deferred payment obligation itself.

The Company acquires the claimant's right to receive payments with respect to legal settlements which are paid to the claimant over a period of years in return for a discounted lump sum payment to the claimant.

Banyon Capital, Banyon Funding, Banyon Investments and Banyon Resources were formed as single-purpose vehicles, and were incorporated on December 22, 2006, April 25, 2008, April 25, 2008, and October 30, 2008, respectively, pursuant to the laws of the State of Nevada.

Galleria Aviation, incorporated on September 18, 2008, purchased two aircraft and has a deposit on a third during the year ended December 31, 2008 to provide air charter activities to the private, corporate and commercial flying public in accordance with Part 135 of the Federal Aviation Regulations.

The Company purchased an office condominium during the year ended December 31, 2008, and has entered into leasing arrangements with an affiliate and various third parties for certain office space. (See Note 5, Related Party Transactions, and Note 6, Rents)

6

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

## NOTE 1 - Summary of Significant Accounting Policies and Other Information (continued)

### Basis of Accounting

These consolidated financial statements have been prepared on the accrual basis of accounting. Under this method, revenues are recognized when earned and expenses are recorded when liabilities are incurred.

### Cash and Cash Equivalents

For the purposes of the consolidated statements of cash flows, the Company considers all highly liquid debt instruments with original maturity dates of less than three months to be cash equivalents. There were no cash equivalents at December 31, 2008 and 2007.

### Revenue Recognition

#### Finance Receivables

The Company purchases finance receivables at a discount from their maturity value. This discount is recorded as unearned income and is netted against finance receivables in the accompanying consolidated financial statements. Unearned income on finance receivables is recognized as finance revenue using the interest method over the life of the related finance receivables.

Certain direct acquisition costs are capitalized and recognized as an adjustment to finance revenue over the contractual lives of the related finance receivables utilizing the interest method. Direct acquisition costs include direct personnel cost, legal, and other costs incurred in connection with originations.

#### Air Charter Activities

Revenue for air charter activities are recognized after an arrangement exists, the price is fixed, and collectibility is reasonably assured.

### Allowance for Credit Losses

The Company maintains an allowance for credit losses at a level that management considers adequate to provide for potential losses in the finance receivable portfolio based upon current economic conditions, past experience, known and inherent risks in the portfolio and other relevant factors. These credit losses principally result from individual payments not collected on finance receivables. The Company will charge-off the defaulted payment balance at the time it determines it to be uncollectible.

7

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

## NOTE 1 - Summary of Significant Accounting Policies and Other Information (continued)

### Property and Equipment

Property and equipment are stated at cost. Depreciation is calculated on the straight-line method over the estimated useful lives of the respective assets as follows: Office condominium – 39 years, Aircraft – 7 years and Furniture and fixtures – 5 years.

The cost of additions and betterments are capitalized and expenditures for repairs and maintenance are charged to expense as incurred. When assets are retired or otherwise disposed of, the cost of such assets and the related accumulated depreciation are removed from the accounts. Any profit or loss resulting from the retirement or disposal of such assets is charged to other income or expenses.

### Fair Value of Financial Instruments

Except as otherwise disclosed, the Company's financial instruments, including receivables and accounts payable, are reported at their carrying value which, in the opinion of management, approximates their fair value and have relatively short-term maturities.

### Concentration of Credit Risk

The Company maintains cash balances at various financial institutions which at times may exceed federally insured limits. At December 31, 2008 and 2007, the Company had excess deposits over the federally insured limit of $7,309,600 and $0, respectively.

### Estimates

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Derivative Instruments and Hedging Transactions

The Company may use derivative instruments to reduce interest rate risk. The Company has established policies and procedures for risk assessment and the approval, reporting and monitoring of derivative instruments. The Company does not hold derivative instruments for trading purposes.

Interest rate swap contracts designated and qualifying as cash flow hedges are reported at fair value. The gain or loss on the effective portion of the hedge initially is included as a component of other comprehensive income (loss) and is subsequently reclassified into earnings when interest on the related debt is paid.

8

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

### NOTE 1 - Summary of Significant Accounting Policies and Other Information (continued)

#### Income Taxes

A limited liability company is treated as a partnership for income tax purposes and is not subject to income taxes. The taxable income or loss of the Company is includible in the individual income tax returns of its members based upon their percentage of ownership. Consequently, no provision for income taxes is recorded in the accompanying consolidated financial statements.

### NOTE 2 -- Finance Receivables

At December 31, 2008 and 2007, finance receivables consist of the following:

|  | 2008 | 2007 |
|---|---|---|
| Legal settlements | $ 517,404,505 | $ 41,947,844 |
| Unearned income | ( 177,099,308) | ( 14,363,545) |
| Deferred acquisition costs, net | 78,104 | 25,138 |
| Carrying value | 340,383,301 | 27,609,437 |
| Allowance for credit losses | - | - |
| Finance receivables, net | $ 340,383,301 | $ 27,609,437 |

At December 31, 2008, the contractual maturities of the finance receivables were as follows:

| 2009 | $ 508,688,180 |
|---|---|
| 2010 | 8,716,325 |
|  | $ 517,404,505 |

There were no finance receivables that were individually identified as impaired for the year ended December 31, 2008 and for the period from inception (December 22, 2006) to December 31, 2007 and therefore the allowance for credit losses attributed to impaired loans amounted to $0 for each period.

9

**BANYON 1030-32, LLC AND AFFILIATES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM**
**INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007**

## NOTE 3 – Notes Payable

At December 31, 2008 and 2007, notes payable consist of the following:

|  | 2008 | 2007 |
|---|---|---|
| Notes payable to investors, interest ranging from ▇ to ▇ payable in full six months from the date of the notes. The notes are secured by the proceeds of various legal settlements and the goods and property of the Company. | $ 40,730,923 | $ 4,528,618 |
| Note payable with an investor with a maximum limit of $150,000,000 that the Company may draw against to purchase legal settlements, interest of ▇%, maturing on June 26, 2013, secured by the proceeds of various legal settlements and the goods and property of the Company. | 117,844,681 | - |
| Note payable with an investor with a maximum limit of $50,000,000 that the Company may draw against to purchase legal settlements, interest of ▇%, maturing on April 3, 2013, secured by the proceeds of various legal settlements and the goods and property of the Company. | 26,054,752 | - |
| In addition to this note, the investor has advanced additional funds to the Company with payment terms as disclosed in Note 4. | 7,062,070 | - |
| Note payable with an investor with a maximum limit of $50,000,000 that the Company may draw against to purchase legal settlements, interest of ▇%, maturing on June 11, 2010, secured by the proceeds of various legal settlements and the goods and property of the Company. | 11,336,737 | - |
| In addition to this note, the investor has advanced additional funds to the Company with payment terms as disclosed in Note 4. | 1,704,000 | - |
| Mortgage payable to Regions Bank, payable in monthly installments of $34,528 including interest at the rate of ▇%, maturing on June 1, 2013, secured by a first mortgage on real estate owned by the Company. | 1,835,182 | - |
| Total | $ 206,568,345 | $ 4,528,618 |

10

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

### NOTE 3 – Notes Payable

Minimum future principal payments required under the above notes payable as of December 31, 2008, for each of the next five years and in the aggregate are:

| Year | Amount |
|------|--------|
| 2009 | $ 204,764,130 |
| 2010 | 33,069 |
| 2011 | 35,320 |
| 2012 | 37,717 |
| 2013 | 40,279 |
| Thereafter | 1,657,830 |
| Total | $ 206,568,345 |

### NOTE 4 – Due to Investors

The Company has entered into agreements with certain investors, whereby funds are advanced to the Company (see Note 3), interest free. Pursuant to these agreements and in consideration of the 0% interest rate, these investors are entitled to an interest in the Company's unearned income on finance receivables. The agreements have no stated maturity dates, but are expected to be repaid within 12 months, and are therefore classified as current liabilities on the accompanying consolidated balance sheets. As of December 31, 2008 and December 31, 2007, the total amount due to investors for their portion of unearned income totaled $3,979,795 and $0, respectively.

### NOTE 5 – Related Party Transactions

The Company leases certain office space to an affiliate under a non-cancelable operating lease expiring on April 30, 2013. As of December 31, 2008 and December 31, 2007, the total amount due from the related party for rent was $50,886 and $0, respectively. Minimum future rental payments to be received from the affiliate as of December 31 for each of the next five years and in the aggregate are as follows:

| Year Ended | |
|------------|--------|
| 2009 | $ 78,237 |
| 2010 | 80,585 |
| 2011 | 83,002 |
| 2012 | 85,489 |
| 2013 | 14,317 |
| Thereafter | -- |
| Total future minimum lease payments | $ 341,630 |

11

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

### NOTE 5 – Related Party Transactions (continued)

The Company is also provided administrative support from this affiliate. As of December 31, 2008 and 2007, the total amount due to the related party was $351,000 and $150,000, respectively.

At December 31, 2008 and 2007, the Company had outstanding advances due from an affiliate in the amount of $10,342,584 and $0, respectively. During the year ended December 31, 2008, the advances were determined to be temporary by the Company and no interest was charged to the affiliate on the outstanding advances.

At December 31, 2008 and 2007, the Company had outstanding advances to another affiliate in the amount of $2,074,962 and $0, respectively. During the year ended December 31, 2008, the advances were determined to be of a long-term nature and interest was charged to the affiliate at an annual rate of ⬤. As of December, 2008 and 2007, interest receivable on these advances totaled $165,997 and $0, respectively.

### NOTE 6 – Rents

The Company also leases certain office space to third parties under non-cancelable operating leases expiring in various years through 2010. During the year ended December 31, 2008 and from the period from inception (December 22, 2006) to December 31, 2007, the Company received $108,755 and $0, respectively, of rental income from third parties, which includes common area maintenance. Minimum future rental payments to be received from third parties as of December 31 are as follows:

|  |  |
|---|---:|
| Year Ended |  |
| 2009 | $ 152,556 |
| 2010 | 25,560 |
| Total future minimum lease payments | $ 178,116 |

### NOTE 7 – Hedging Transactions

On May 30, 2008, the Company entered into an interest rate swap agreement with a notional amount of approximately $1.85 million to reduce the impact of changes in interest rates on the Company's mortgage payable. This agreement effectively converts the fixed rate of ⬤% to a variable rate based on LIBOR but not to exceed the fixed rate on the $1.85 million mortgage payable. The Company designated this interest rate swap as a cash flow hedge. As of December 31, 2008 and 2007, the fair value of the cash flow hedge was $(209,121) and $0, respectively, which has been recorded as other comprehensive loss and will be reclassified to interest expense over the life of the swap agreement. The Company's credit risk is limited to the fair market value of the interest rate swap agreement. The agreement matures on June 1, 2013.

## BANYON 1030-32, LLC AND AFFILIATES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2008 AND FOR THE PERIOD FROM
## INCEPTION (DECEMBER 22, 2006) TO DECEMBER 31, 2007

### NOTE 8 – Risks and Uncertainties

The Company is subject to numerous risks associated with finance receivables. The risks include, but are not limited to, restrictions on the assignability of legal settlements, confidentially provisions, a change in the U.S. tax law, and other potential risks of regulation and/or legislation.

Significant estimates are made by management in determining the allowance for credit losses, the fair value of securitized assets retained and certain deferred acquisition costs. Consideration is given to a variety of factors in establishing these estimates, including current economic conditions, the results of internal review processes, and the existence of delinquencies, if any. Since the allowance for credit losses is dependent on general and other economic conditions beyond the Company's control, it is at least reasonably possible that the estimates could differ materially from currently reported values in the term.

13